UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. _____ |
| | : | |
| Plaintiff | : | |
| vs. | : | JUDGE WATSON |
| | : | |
| KEDAR K. DESHPANDE, | : | 18 U.S.C. §2 |
| | : | 18 U.S.C. §1035 |
| | : | 18 U.S.C. §1347 |
| Defendant. | : | 18 U.S.C. §1349 |
| | : | 21 U.S.C. §841(a)(1) and (b)(1(C) |
| | : | 21 U.S.C. §846 |
| | : | |

**2:19 cr 73**

**Judge Sargus**

## INDICTMENT

THE GRAND JURY CHARGES:

### INTRODUCTION

At all relevant times to this Indictment, and unless otherwise alleged:

1.    Defendant KEDAR K. DESHPANDE (hereinafter "DESHPANDE") was a physician who obtained his medical license from the Ohio State Medical Board in 2002 and was the owner of Orthopaedic and Spine Center, LLC. (hereinafter "OSC"),  a pain management facility.

2.    OSC opened in 2004 at 1080 Polaris Parkway, Columbus, Ohio. OSC was later relocated to 6810 Perimeter Drive, Dublin, Ohio, both of which were located in the Southern District of Ohio.

### The Controlled Substance Act and the Code of Federal Regulations

3.    The Controlled Substances Act (CSA) governs the manufacture, distribution, and dispensation of controlled substances in the United States. The term "controlled substance" means

1

a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV, and V, as designated by Title 21, United States Code, Section 802(6) and the Code of Federal Regulations. With limited exceptions for medical professionals, the CSA makes it "unlawful for any person knowingly or intentionally" to "distribute or dispense a controlled substance" or conspire to do so.

4.      The CSA's scheduling of controlled substances were based on their potential for abuse, among other considerations. There are five schedules of controlled substances: Schedules I, II, III, IV and V. "Schedule I" means the drug or other substance has no currently accepted medical use and has a high potential for abuse. The term "Schedule II" means the drug or other substance has a high potential for abuse. The drug has a currently accepted medical use with severe restrictions, and the abuse of the drug or other substance may lead to severe psychological or physical dependence. The term "Schedule III" means the drug or other substance has a potential for abuse and could lead to moderate or low physical and psychological dependence. The term "Schedule IV" means the drug or other substance has a low potential for abuse and low risk of dependence. The term "Schedule V" means the drug or other substance has a low potential for abuse.

5.      The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner; it included the prescribing of a controlled substances. The term "distribute" means to deliver (other than by administer or dispensing) a controlled substance.

6.      Medical professionals, including doctors and pharmacists, who wanted to distribute or dispense controlled substances in the course of professional practice were required to register with the Attorney General of the United States (Attorney General) before they were legally

authorized to do so. Such medical professionals would be assigned a registration number by the DEA.

7.      Deshpande received a DEA registration number that allowed him to prescribe controlled substances, including Schedules II through V, for a legitimate medical purpose while acting in the usual course of professional practice.

8.      Medical professionals registered with the Attorney General were authorized under the CSA to write prescriptions for or to otherwise dispense Schedule II, III, IV, and V controlled substances, as long as they complied with the requirements of their registration. 21 U.S.C. §822(b). The CSA prohibited any person from knowingly and intentionally using a DEA registration number issued to another person in the course of distributing or dispensing a controlled substance.

9.      For doctors, compliance with the terms of their registration meant that they could not issue a prescription unless it was "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. §1306.04(a). A doctor violated the CSA and Code of Federal Regulations if he or she issued an order for a controlled substance outside the usual course of professional medical practice and not for a legitimate medical purpose. Such an order is "not a prescription within the meaning and intent of the CSA," and such knowing and intentional violations subjected the doctor to criminal liability under Section 841 of Title 21, United States Code. 21 C.F.R. §1306.04(a).

10.     21 C.F.R. §1306.05(a) provides that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner."

3

## The Victim Health Care Programs

11.      The information provided in this section describes the victim health care benefit programs and serves as the R. Crim P. 12.4 Disclosure Statement.

## The Medicaid Medicare and Tricare Programs

12.      Medicaid, established by Congress in 1965, provided medical insurance coverage for individuals whose incomes were too low to meet the costs of necessary medical services. Approximately 60% of the funding for Ohio's Medicaid program came from the federal government.  The Ohio Department of Medicaid (ODM), Columbus, Ohio, managed the Medicaid program, which was managed previously by the Ohio Department of Job and Family Services (ODJFS).  ODM received, reviewed, and obtained formal authority to make payment of Medicaid claims submitted to it by providers of health care.

13.      ODM contracted with Medicaid Managed Care Organizations (MCOs) through contracts known as Contractor Risk Agreements (CRAs), which conformed to the requirements of 42 U.S.C. §§1395mm and §1396b(m), along with any related federal rules and regulations. MCOs were health insurance companies that provided coordinated health care to Medicaid beneficiaries. The MCOs contracted directly with healthcare providers, including hospitals, doctors, and other health care providers to coordinate care and provide the health care services for Medicaid beneficiaries. Providers who contracted with an MCO, were known as Participating Providers. Pursuant to the CRAs, ODM distributed the combined state and federal Medicaid funding to the MCOs, which then paid Participating Providers for treatment of Medicaid beneficiaries.

14.      CareSource and Molina were Medicaid MCOs that paid claims for medical services and items submitted by OSC.

4

15.     Medicaid paid health care providers, pursuant to written agreements, on the basis of reasonable charges for covered services provided to beneficiaries.

16.     Pursuant to the rules and regulations of the Ohio Medicaid Program, including Medicaid MCOs, Medicaid only paid for services that were actually performed by qualified individuals, were medically necessary, and provided in accordance with Federal and State laws rules and regulations.

17.     The Medicare Program was enacted by Congress on July 30, 1965, under Title XVIII of the Social Security Act.  The Medicare Program was designed to provide medical insurance protection for covered services to any person age 65 or older, and to certain disabled persons.  Medicare is a health care benefit program as defined in 18 U.S.C. Section 24(b) and within the meaning of 18 U.S.C. Sections 1347 and 1035.

18.     The United States Department of Health and Human Services ("HHS") was, and is an agency of the United States.  The Centers for Medicare and Medicaid Services ("CMS") was the agency of HHS delegated with administering Medicare.

19.     CMS administered Medicare Part B through private insurance companies known as "carriers."  Medicare Part B helped pay the cost of health care items and physician's services, including office visits, outpatient therapy, medical supplies and medical tests.

20.     Medicare Part D subsidized the costs of prescription drugs for Medicare beneficiaries in the United States. It was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006. Part D benefits were administered by private insurance plans that were reimbursed by Medicare through CMS.

21.     Beneficiaries could obtain Part D benefits in two different ways: they could join a

Prescription Drug Plan which covered only prescription drugs; or they could join a Medicare Advantage Plan that covered both prescription drugs and medical services.

22.     Typically, a Medicare beneficiary enrolled in a Medicare Part D plan would fill their prescription at a pharmacy utilizing their Medicare Part D plan coverage to pay for the prescription. The pharmacy would then submit the prescription claim for reimbursement to the Medicare Part D beneficiary's plan for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan identification number.

23.     Tricare, formerly known as CHAMPUS, was a federal health benefits program, established by 10 U.S.C. §§ 1071-1110, that offered a triple option benefit plan: an HMO option; a PPO option; and a fee for service option.  Tricare was administered by the Secretary of Defense. Tricare provided health care benefits to eligible beneficiaries, which included, among others, active duty service members, retired service members, and their dependents.

24.     The regulatory authority establishing Tricare provided reimbursement to individual health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies. Services and items that were not medically necessary for the diagnosis or treatment of a covered illness or injury, or not provided by a qualified medical professional were excluded from coverage.

25.     In order to be reimbursed by Medicare, Tricare or Medicaid for medical services, a provider rendering a service to beneficiaries must have entered into a "provider agreement" with Medicare, Medicaid or Tricare in which the provider agreed to comply with all applicable state and federal statutes, regulations and guidelines.

26.     Providers who provided services to Medicare, Tricare and Medicaid beneficiaries used a number assigned to the patient to fill out claim forms. The claim form was submitted by

6

the provider to make claims for payment to Medicaid, Medicare or Tricare. Medicaid, Medicare or Tricare processed each health insurance claim form and issued payment to the provider for the approved services.  Providers submitted claims in paper format, or by electronic means.

27.     Health care claim forms, both paper and electronic, contained certain patient information and treatment billing codes including CPT, HCPCS, and NDC codes.  Health care programs had established payment schedules based on the codes billed by the provider. By designating a certain code, the provider certified to the health care program that a given treatment was actually rendered in compliance with the code requirements and was medically necessary.  These treatment billing codes were well known to the medical community, providers, and health care insurance companies.

28.     Medicare, Tricare and Medicaid used the written claim forms and or electronic invoices to establish the validity of health care claims entitled to payment.  A provider who submitted claims to Medicaid, Medicare or Tricare certified that the treatment was provided by a qualified individual, actually given to the patient as documented and was medically necessary for the health of the patient.

Coding

29.     The American Medical Association assigned and published numeric codes known as the Current Procedural Terminology (CPT) and HCFA Common Procedure Coding System (HCPCS) codes. The codes were a systematic listing, or universal language, used to describe the procedures and services performed by health care providers. The procedures and services represented by the codes were health care benefits, items, and services within the meaning of Title 18, United States Code Section 24(b). They included codes for office visits, diagnostic testing and evaluation, and other services. Drug products were identified and reported to the

7

Federal Drug Administration using a unique three (3) segment number called the National Drug Code (NDC), which was  a universal product identifier for human drugs. Health care providers and health care benefit programs use CPT, HCPCS, and NDC codes to describe and evaluate the services and drugs for which they claim have been provided in order to decide whether to issue or deny payment. Each health care benefit program establishes a fee reimbursement for each drug or service described by a CPT, HCPCS, and/or NDC code. The procedures and services represented by CPT codes were health care benefits, items, and services, within the meaning of Title 18, Section 24(b), United States Code.

30.     Specific CPT codes were assigned for evaluation and management (E/M) services provided to establish patients in a physician's office (some of the E/M services were known as "office visits"). Among these E/M services were office visits billed under CPT codes "99211," "99212," "99213," "99214," and "99215."  Insurance companies reimbursed health care providers at increasing rates based upon the level of complexity indicated by the office visit codes.  The codes for 99211 through 99215 provided in relevant part:

a.  99211: Office or other outpatient visit for the evaluation and management of an established patient that may not require the presence of a physician. Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

b.  99212: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 components: (1) a problem-focused history; (2) a problem-focused examination; (3) straightforward medical decision-making. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are self-limited or minor. Physicians typically spend 10 minutes face-to-face with the patient and/or family.

c.  99213: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 components: (1) an expanded problem-focused history; (2) an expanded problem-focused examination; (3) medical decision-making of low complexity. Counseling

and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of low to moderate severity. Physicians typically spend 15 minutes face-to-face with the patient and/or family.

d. 99214: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: (1) a detailed history; (2) a detailed examination; (3) medical decision-making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Physicians typically spend 25 minutes face-to-face with the patient and/or family.

e. 99215: Office or outpatient visit for the evaluation and management of an established patient which requires at least 2 of these 3 key components: (1) a comprehensive history; (2) a comprehensive examination; (3) medical decision making of high complexity. Usually, the presenting problem(s) are of moderate to high severity. Typically, 40 minutes are spent face to face with the patient and/or family.

31.  CPT codes 99212 through 99215 are required to be performed by a physician or qualified health care professional and billed under the name of physician or qualified health care professional that provided the services.

32.  Medicaid, Medicare and Tricare were health care benefit programs as defined in 18 U.S.C. §24.

<u>The Ohio Bureau of Workers Compensation (BWC)</u>

33.  The Ohio Bureau of Workers Compensation (BWC) is a public "no fault" insurance system that compensates employees for work related injuries or illnesses. Currently BWC provides insurance to approximately two-thirds of Ohio's work force. Employees not covered directly by BWC receive coverage through their employers. These companies are part of a self-insurance program for large and financially stable employers who meet strict qualifications set by BWC.

9

34.     BWC manages all medical and lost-time claims, initiates coverage and determines premium rates and manual classifications. BWC also collects premiums from employers, determines the initial allowance or denial on claim applications, disburses money to pay compensation, and manages the state insurance fund.

35.     Similar to Medicaid, BWC also utilizes MCOs to assist with the administration of benefits and services to BWC beneficiaries.

36.     Providers who are certified with BWC receive a Provider Identification Number (PIN) which allows BWC to identify the provider who rendered the billed services. In addition, each qualified BWC patient receives a member Identification Number to identify the patient as an authorized recipient of health benefits.

37.     BWC further requires certified providers to properly document patient office visits in accordance with BWC policies, rules and regulations.

38.     Providers will be reimbursed by BWC for rendered medical services provided they are certified by BWC, the services provided were properly documented and in accordance with BWC rules and regulations, were medically necessary, properly coded and in compliance with federal and state laws, rules and regulations.

<u>Provider Agreements</u>

39.     Health care providers enter into provider agreements with BWC in order to submit claims for reimbursement. BWC requires that the provider be licensed with the appropriate State Board governing the laws of their specialty.

40.     Participating providers agree to provide services, submit the claims and accept payments as specified in fee schedules, pricing formulas, and terms of the provider agreement/contract from BWC.  The provider signs a provider agreement which requires them to

retain complete records and fully disclose the services provided to members of BWC.  The provider of services, in order to receive reimbursement, submits a Health Insurance Claim form in a paper or an electronic format to be approved by BWC.  Based upon information submitted by the provider representing services rendered, BWC pays the provider either by mail or electronic transfer.

<u>Submission of Claims</u>.

41.     Similar to Medicare and Medicaid, medical providers who provide services to BWC patients use Claim Forms in paper format or by electronic means. Health care claim forms, both paper and electronic, contain certain patient information and CPT codes.

42.     BWC is a "health care benefit program" as defined in 18 U.S.C. §24(b).

<u>COUNT 1</u>
Conspiracy to Dispense and Distribute Controlled Substances
[21 U.S.C. §846]

The Grand Jury further charges that:

43.     Paragraphs 1 through 42 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

44.     Beginning on or about March 24, 2014 and continuing through May 26, 2016, within the Southern District of Ohio, KEDAR K. DESHPANDE,  along with others known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to knowingly, intentionally, and unlawfully distribute and dispense, or caused to be distributed and dispensed through prescriptions, mixtures of substances containing  a detectable amount of a Schedule II

11

controlled substance, other than for a legitimate medical purpose in the usual course of professional practice, in violation of 21 U.S.C. §841(a)(1) and §(b)(1)(C).

In violation of 21 U.S.C. §846.

### Nature and Purpose of Conspiracy

The purpose of the conspiracy was to maximize profits and cause the illegal dispensing of controlled substances, such as oxycodone, morphine, hydrocodone and other Schedule II pain medications, by prescribing such medications outside the bounds of the accepted medical practice.

### Ways, Manners and Means of the Conspiracy

45.     It was part of the conspiracy that DESHPANDE would pre-sign blank prescriptions for OSC staff to complete and dispense to patients in his absence.

46.     It was further part of the conspiracy that at the direction of DESHPANDE and co-conspirators, the office staff would fill-in the prescriptions with Schedule II controlled substances, including oxycodone, morphine and hydrocodone before dispensing to OSC patients.

47.     It was further part of the conspiracy that at the direction of DESHPANDE and co-conspirators, the pre- signed prescriptions were completed and dispensed by OSC staff, including, but not limited to, medical assistants who were not legally qualified to issue, distribute or dispense prescriptions for controlled substances.

48.     It was further part of the conspiracy that at the direction of DESHPANDE and co-conspirators, the office staff would mostly dispense the pre-signed prescriptions when DESHPANDE was on vacation, arrived late to the office or was otherwise not at OSC.

49.     It was further part of the conspiracy that at the direction of DESHPANDE and co-conspirators, office staff, including medical assistants who were not legally qualified to treat

patients, would conduct "Nurse Visits", consisting of OSC staff seeing and treating patients without DESHPANDE or qualified health care professional seeing or examining the patient.

50.    It was further part of the conspiracy that during the nurse visits and at the direction of DESHPANDE and co-conspirators, OSC staff completed and dispensed the pre-signed prescriptions for controlled substances to OSC patients.

In violation of 21 U.S.C. §841(a)(1), §(b)(1)(C) and §846.


## COUNTS 2 THROUGH 8
Illegal Dispensing of Schedule II Controlled Substances
[21 U.S.C. §841(a)(1), §841(b)(1)(C) and 18 U.S.C. §2]

51.    On or about the dates set forth below, in the Southern District of Ohio, Defendant KEDAR K. DESHPANDE, aided and abetted by individuals both known and unknown to the Grand Jury, knowingly, intentionally and illegally dispensed and distributed a quantity of Schedule II controlled substances, as identified in the chart below, not for a legitimate medical purpose in the usual course of professional practice:

| COUNT | PATIENT INTIALS | DATE PRESCRIPTION ISSUED | SCHEDULE II CONTROLLED SUBSTANCE | QUANTITY |
|---|---|---|---|---|
| 2 | JS | 6/18/2015 | Oxycodone-20mg | 120 |
| 3 | JG | 12/29/2015 | Hydrocodone 10mg | 60 |
| 4 | RC | 10/21/2015 | Oxycodone 40mg (OxyContin) | 60 |
| 5 | RC | 11/18/2015 | Oxycodone 40mg (OxyContin) | 60 |
| 6 | JB | 12/1/2015 | Oxymorphone 40mg (Opana) | 120 |
| 7 | AZ | 11/30/2015 | Morphine Sulfate—30mg | 60 |
| 8 | GR | 6/15/2015 | Hydrocodone 10mg (Norco) | 135 |

All in violation of 21 U.S.C. §841(a)(1), §841(b)(1)(C) and 18 U.S.C. §2.

COUNT 9
Conspiracy to Commit Health Care Fraud
[18 U.S.C. 1349]

52.     Paragraphs 1 through 42 and 45 through 50 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

53.     From on or about March 24, 2014 through on or about May 26, 2016, in the Southern District of Ohio, Defendant KEDAR K. DESHPANDE, did knowingly and willfully combine, conspire, confederate and agree with others, both known and unknown to the Grand Jury, to violate 18 U.S.C. § 1347, that is, to execute a scheme to defraud a health care benefit program as defined in 18 U.S.C. §24(b), that is the Ohio Medicaid Program, the Medicare and Tricare Program and the Ohio Bureau of Workers Compensation, in connection with the delivery or payment for health care benefits, items or services.

Purpose of the Conspiracy

54.     It was the purpose of the conspiracy that DESHPANDE and co-conspirators unlawfully enriched themselves by submitting claims or causing claims to be submitted to health care benefit programs for: 1) prescriptions for controlled substances that were illegally dispensed and distributed; 2) medical services that were provided by individuals who were not qualified to provide such services; 3) services provided by a physician assistant who was not credentialed with the health care benefit program billed by OSC; and 4) up-coded office visits provided by DESHPANDE.

14

Manner and Means of the Conspiracy

55.     It was part of the conspiracy that DESHPANDE and co-conspirators, caused the submission of claims to health care benefit programs for controlled substances that were dispensed and distributed by pharmacies as a result of the pre-signed prescription that were illegally issued to OSC patients.

56.     It was further part of the conspiracy that DESHPANDE submitted or caused the submission of claims to health care benefit programs for services provided to OSC patients by unqualified individuals during "nurse visits".

57.     It was further part of the conspiracy that DESHPANDE would electronically sign the treatment notes for the nurse visits as if he were the qualified health care provider conducting the office visits and providing the services.

58.     It was further part of the conspiracy that DESHPANDE and co-conspirators would direct an OSC physician assistant to see and treat patients who were insured by CareSource knowing that the physician assistant was not credentialed with CareSource.

59.     It was further part of the conspiracy that DESHPANDE would electronically sign the treatment notes for the physician assistant as if he had seen and treated the patients.

60.     It was further part of the conspiracy that DESHPANDE caused the submission of claims for up-coded office visits that were billed under CPT code 99214s, falsely representing the level of exam and medical decision making used during the office visit, in order to receive inflated reimbursement from the health care benefit programs.

In violation of 18 U.S.C. §1347 and §1349.

COUNT 10
Health Care Fraud
[18 U.S.C. §1347]

61.     Paragraphs 1 through 42, 45 through 50 and 55 through 60 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

62.     From on or about March 24, 2014, through on or about May 26, 2016, in the Southern District of Ohio, Defendant KEDAR K. DESHPANDE, knowingly and willfully executed a scheme or artifice to defraud a health care benefit program as defined by 18 U.S.C. §24, in connection with the delivery or payment for, health care benefits, items or services by causing the submission of claims to health care benefit programs for prescriptions that were issued in violation of law or otherwise outside the bounds of accepted medical practice.

All in violation of 18 U.S.C. §1347 and §2.

COUNT 11
Health Care Fraud
[18 U.S.C. §1347]

63.     Paragraphs 1 through 42, 45 through 50 and 55 through 60 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

64.     From on or about March 24, 2014, through on or about April 12, 2016, in the Southern District of Ohio, Defendant KEDAR K. DESHPANDE, knowingly and willfully executed a scheme or artifice to defraud a health care benefit program as defined by 18 U.S.C. §24, in connection with the delivery or payment for, health care benefits, items or services by causing the submission of claims to health care benefit programs for medical services that were provided by OSC staff who were unqualified to provide such services.

All in violation of 18 U.S.C. §1347 and §2.

COUNT 12
Health Care Fraud
[18 U.S.C. §1347]

65.     Paragraphs 1 through 42, 45 through 50 and 55 through 60  of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

66.     From on or about May 5, 2014, through on or about July 9, 2015, in the Southern District of Ohio, Defendant KEDAR K. DESHPANDE, knowingly and willfully executed a scheme or artifice to defraud a health care benefit program as defined by 18 U.S.C. §24, in connection with the delivery or payment for, health care benefits, items or services by causing the submission of claims to CareSource and for services provided by a physician assistant who was not credentialed with CareSource.

All in violation of 18 U.S.C. §1347 and §2.

COUNTS 13 through 19
False Statements Relating to Health Care
[18 USC 1035]

67.     Paragraphs 1 through 42, 45 through 50 and 55 through 60 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

68.     On or about the dates listed below, in the Southern District of Ohio, Defendant Kedar K. Deshpande, knowingly, willfully and in connection with the payment for health care benefits, items or services involving a health care benefit program, that is Medicare, Medicaid CareSource, and BWC, falsified, concealed or covered up by trick or scheme a material fact, that is caused the submission of claims for services or items that were illegally provided, provided by an unqualified or non-credentialed OSC staff member, or provided by an OSC staff member other than the medical professional under whose name the claims were submitted, as follows:

17

| Count | Patient | Date of Service | Date Claim Paid | Amt. Paid | Type of service | HCBP |
|-------|---------|-----------------|-----------------|-----------|-----------------|------|
| 13 | JG | 12/29/2015 | 1/20/2016 | $59.60 | Nurse Visit | BWC |
| 14 | SA | 7/21/2015 | 8/6/2015 | $33.01 | Nurse Visit | Medicare |
| 15 | DC | 5/6/2015 | 6/5/2015 | $88.65 | Illegal Prescription | CareSource |
| 16 | KE | 9/30/2015 | 10/16/2015 | $156.34 | Illegal Prescription | BWC |
| 17 | SB | 4/6/2015 | 4/25/2015 | $64.30 | Non-credentialed PA services | CareSource |
| 18 | MB | 1/27/2015 | 1/31/2015 | $64.30 | Non-credentialed PA services | CareSource |
| 19 | UC visit | 11/17/2015 | 2/12/2016 | $148.31 | Up-coded Office Visit | BWC |

All in violation of 18 U.S.C. §1035 and §2.

A TRUE BILL.

s/Foreperson
FOREPERSON

BENJAMIN C. GLASSMAN
UNITED STATES ATTORNEY

s/Kenneth F. Affeldt
KENNETH F. AFFELDT (0052128)
Assistant United States Attorney

s/Maritsa A. Flaherty
MARITSA A. FLAHERTY (0080903)
Assistant United States Attorney

s/Jonathan Metzler
JONATHAN METZLER (0063508)
Special Assistant United States Attorney